[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-15703

_____

D.C. Docket No. 5:12-cv-00396-RH-EMT

JUAN L. JENKINS,

Plaintiff-Appellant,

versus

SLOAN,
Assistant Warden,
NORMA GILO,
Chief Health Officer,
PAM MILLER,
Nurse Practitioner,
KRYSTAL AKE,
Sen Health Ser Adm,
DIXIE MCCORVEY,
LPN,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(September 9, 2020)

Before BRANCH, LUCK, and ED CARNES, Circuit Judges.

PER CURIAM:

Juan Jenkins, a Florida prisoner, appeals the dismissal of his 42 U.S.C. § 1983 suit against Gulf Correctional Institution ("GCI") employees Assistant Warden Sloan, Health Administrator Krystal Ake, L.P.N. Dixie McCorvey, Nurse Pam Miller, and Dr. Norma Gilo (collectively, "defendants"), for deliberate indifference to Jenkins's serious medical needs. The district court dismissed the complaint upon a finding that Jenkins failed to exhaust his administrative remedies. After review, and with the benefit of oral argument, we reverse and remand with instructions for the district court to complete the proper analysis for whether Jenkins had available remedies that he failed to exhaust.

## I.    Background

Jenkins filed this *pro se* action in 2012. His third amended complaint—the operative complaint—alleged the following. On Saturday, December 20, 2008, while housed at GCI, Jenkins was severely injured when a heavy, metal dining room table collapsed on him. At the time, while he was in severe pain, Defendant McCorvey denied his request for an orderly and a wheelchair so that he could get to the medical wing. Jenkins was threatened by McCorvey that if he did not come to the medical wing, even without a wheelchair, he was going to be "locked up" for filing a false medical emergency. With the assistance of other inmates, Jenkins

2

made it to the medical wing, where McCorvey took his vitals and observed swelling on his knee and elbow.  McCorvey refused Jenkins's request to call a doctor because his injuries did not meet medical emergency criteria and the doctor was not available on the weekend.  She also refused his request for a splint or pain medication.

The following Monday, December 22, Jenkins was scheduled to have x-rays performed on his legs.  Jenkins, who complained of loss of feeling in his left leg from the hip down and swelling with bruising on his right knee, again asked for—and was denied—a wheelchair.  His request was denied by Defendant Miller, who also refused his stretcher request so that he could be transported to medical.  An attending officer told him to declare a medical emergency so a wheelchair would come, which Jenkins did, but the wheelchair caused Jenkins to bend his knee which increased his pain.

When Jenkins arrived in the x-ray room with Nurse Miller, Miller allegedly refused to treat or assess his injuries.  Miller also refused his request for a hospital physician to assess his injuries.  The x-ray of his knee showed possible bone fragments, but Miller refused to send him to the hospital or to order any medication for his pain.  Jenkins alleged "Miller said she was sick and tired of these table incidents. And she was already tired of me. . . . Miller told the X-ray tech to hurry up with this one."  Miller directed the x-ray tech to x-ray Jenkins's hip while

3

Jenkins was still sitting in the wheelchair to avoid him having to get out of the chair due to the extent of the injuries, but this position did not produce a useable image. However, when the x-ray tech suggested sending Jenkins to the hospital for an assessment, Miller refused because the hospital would "keep him" if her suspected diagnosis was true and she did not want the hospital to admit him. Following the x-rays, another nurse brought Jenkins a form to sign stating that he was refusing medical treatment, and when Jenkins refused to sign the form, the nurse told him that they could just forge his signature or say he verbally refused. The following day, Jenkins was transported to the medical annex of the prison, and then to a local hospital several days later. He alleged that Miller's deliberate indifference by refusing to send him directly to the hospital worsened his condition and caused him to spend a week and a half in the hospital.

Jenkins also alleged in his complaint that he filed grievances against the medical department over these incidents. His complaint states that Dr. Gilo, the head of the medical department, "[r]etaliated continuously" for his grieving the delays caused by Nurse Miller. Specifically, prior to Jenkins being transferred to the hospital, Gilo told Jenkins he would either "walk or die" without assistance of a wheelchair. Gilo allegedly mandated that no sick-calls or pain medication be given to Jenkins; performed an "assessment" of Jenkins's back wherein she jabbed him so hard he yelled and thought he was having a heart attack; denied a request for an

4

ambulance after Jenkins's vitals dropped to a dangerous level; removed the urinal from his stall and said she hoped he urinated on the bed and got beaten up for it; and told him that "[y]ou need to heal yourself." And upon his return to GCI following the hospital stay, Gilo took away his wheelchair and wrist splint, which had been offered to him by the hospital, and continued to deny Jenkins's various other medical requests without medical cause throughout 2010. Jenkins alleged that he grieved these issues, but that Defendant Ake "supported and condoned" Gilo's behavior. And nurses under Gilo's supervision locked Jenkins in confinement for initiating the grievance process.

Finally, Jenkins made allegations against Defendant Sloan, the assistant warden. Jenkins stated that Sloan secretly kept a grievance folder of all of Jenkins's requests so that the warden did not know about them. Sloan threatened Jenkins with "months of confinement" if he continued to grieve the medical department. Sloan also physically beat up Jenkins on one occasion because of his grievances and told Jenkins "there will be no incident reports" because "I destroyed them and this one also." After he injured Jenkins, Sloan told Jenkins he would not receive any medical treatment for his injuries as "pay back" for his grievances.

5

Jenkins alleged that the retaliatory actions and deliberate medical indifference displayed by the defendants continued from 2008 to 2012, right before he initiated the lawsuit.

The defendants filed a motion to dismiss, arguing that Jenkins had failed to exhaust his administrative remedies: "While Plaintiff may have haphazardly grieved some of the claims [he] raised in his complaint at one level or another, none of his claims have been raised sequentially and exhausted through the two-three step grievance procedure."  In support of this motion, the defendants attached Jenkins's grievance record, which contained nine informal grievances, two formal grievances, and three grievance appeals to the Office of the Secretary from the time period of March, 2010 to July, 2012, along with declarations from the various custodians of record to the authenticity of these records.

To understand the government's argument, we provide some background on the Florida grievance procedure.  The FDC's grievance procedure is codified in the Florida Administrative Code.  *See* Fla. Admin. Code Ann. §§ 33-103.005–33-103.011.  We have previously summarized the proper procedure as follows:

> The grievance procedures promulgated by the Florida Department of Corrections ("FDOC") require an inmate to (1) file an informal grievance to the staff member responsible for the particular area of the problem; (2) file a formal grievance with the warden's office; and (3) submit an appeal to the Office of the Secretary of the FDOC. However, if an inmate is filing a medical grievance, as was the case here, the initial informal grievance step may be omitted.

6

*Parzyck v. Prison Health Servs., Inc.*, 627 F.3d 1215, 1218 (11th Cir. 2010) (citation omitted); *see also Dimanche v. Brown*, 783 F.3d 1204, 1211 (11th Cir. 2015).  Most grievances start at the informal grievance level, with two exceptions.  First, several categories of grievances, including "medical grievance" or "grievance of reprisal," may begin as a formal grievance.  Fla. Admin. Code Ann. r. 33-103.005.  Second, an even smaller category of grievances, such as grievances of an emergency nature or reprisal, may be filed directly with the Office of the Secretary, which is normally reserved for grievance appeals.  *See id.*

An informal grievance is made on the form entitled "Inmate Request," Form DC6-236.  *Id.*  Each informal grievance must address only one issue.  *See id.*  The institution is required to respond to the informal grievance within fifteen days.  *See id.*  Formal grievances are filed using a "Request for Administrative Remedy or Appeal," Form DC1-303.  Fla. Admin. Code Ann. r. 33-103.006.  Inmates must attach a copy of the informal grievance, unless the formal grievance belongs to that category of grievances which may be directly filed as formal.  *See id.*

If an inmate is unsatisfied with the resolution of a formal grievance, he may appeal the grievance to the Office of the Secretary using Form DC1-303 (same form as a formal grievance).  *See* Fla. Admin. Code Ann. r. 33-103.007.  The inmate must attach the formal grievance and response to the appeal, unless the

7

appeal is in the limited category which may be directly filed with the Office of the Secretary. *Id.*

The code also specifies time frames applicable to the various types of grievances. Informal grievances must be received by the institution within 20 days of when the incident or action being grieved occurred. *See* Fla. Admin. Code Ann. r. 33-103.011. An inmate may submit a request for a time extension for an informal grievance, in which case the inmate has 45 days to file it. *See id.* For formal grievances, the form must be received by the institution no later than 15 days from either the incident or the date of the response to the informal grievance, depending on what route the formal grievance is following. *See id.*

The government argued that Jenkins's grievance record demonstrated that Jenkins had not complied with the proper grievance procedures detailed above with respect to any of his complaints. For example, the government noted that some of Jenkins's grievances labeled as "formal" grievances were actually on the informal grievance forms. Further, Jenkins failed to appeal or file directly with the Office of the Secretary any grievances regarding reprisal against him by prison staff.

Jenkins responded to the motion to dismiss, arguing that he did not fail to exhaust his administrative remedies because those remedies were made unavailable to him by the defendants' actions. Jenkins attached to his response a sworn affidavit, which repeated some of the allegations in the initial complaint but

8

included more specific details regarding the grievance reprisals. Jenkins connected many of the threatening incidents he had listed in his complaint to grievance reprisals and explained that these threats were the reason he was not able to complete the grievance process properly. Specifically, Jenkins averred that he initially grieved the denial of medical attention he received for the table incident on December 22, 2008. One of the captains at the prison ripped up his grievance and threatened Jenkins "not to write another one or I'll put you in confinement so long that by the time you get out Jesus would have came back and gone again." Jenkins was also told by this captain that the staff was "screening" his grievances and would intercept and destroy anything with his name on it. Another officer told him that "medical knows about your table incident" and "you need to give them a break." The officer accused Jenkins of being the "dumb****" inmate who thought he "would file a grievance against medical and it would just slip through un-noticed." Jenkins alleged that when he was initially being x-rayed by Nurse Miller, she asked if Jenkins had attempted to write her and her staff up over the weekend. Although Jenkins didn't answer, later in the examination Miller stated that she usually would have had someone in his position transferred to the hospital "but this one here wants to grieve us, so he can get there on his own if he can." Further, she allegedly stated "[s]ince you want to attempt stunts for whatever reason by attempting to file a grievance against my medical staff apparently you

9

don't need our help." Jenkins alleged that when he was transferred to the medical annex on December 24, 2008, he was first visited by Gilo, who said "this is the one that write grievances" and he must be "stupid as something." Gilo then stated "you will not leave this infirmary unless you are deceased and I don't care whether you live or die understand that." Gilo clarified that she didn't care if he lived or died because she felt Jenkins was going to try and sue the prison because "that's what grievance writers try to do" and that, if he continued, "she would make a[n] attempt to medically get rid of [Jenkins]." Jenkins alleged that, in 2008, he stopped attempting to file grievances based on Gilo's threats. The affidavit also contained details of alleged reprisals visited on him by the other defendants. At the end of his affidavit, Jenkins summarized the ways in which the prison had made the administrative remedies not available to him, which included "[b]eing threatened by staff," "[b]eing provided the wrong forms for accessing administrative remedies," "[r]emoval of exhibits attached to formal grievances," and "[a]ltering and destroying request forms."

The magistrate judge issued a report and recommendation ("R&R") which recommended dismissing Jenkins's claims for failure to exhaust administrative remedies as required under the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(a). The R&R cited the general law for exhaustion, as well as this Circuit's two-step process for determining exhaustion. After reviewing the

applicable grievance procedures and the allegations in Jenkins's complaint, the magistrate judge concluded that Jenkins failed to exhaust administrative remedies by not filing formal grievances, or not attaching the required forms to his grievance appeals, and failing to appeal certain issues. As for Jenkins's claim that the grievance system was unavailable due to the defendants' retaliation, the magistrate judge concluded that Jenkins's "broad, conclusory assertion[s] of retaliation" were insufficient to demonstrate that the grievance system was rendered effectively unavailable to him. The magistrate judge further reasoned that Jenkins would be unable to prove he was subjectively deterred from using the prison system because he was "freely able to access the grievance process," as evidenced by his filing of some grievances. The district court summarily adopted the R&R as the court's opinion and dismissed Jenkins's complaint for failure to exhaust administrative remedies. This appeal followed.

## II.    Standard of Review

"We review *de novo* the district court's interpretation of section 1997e(a)'s exhaustion requirements and application of that section to [a plaintiff's] claims." *Higginbottom v. Carter*, 223 F.3d 1259, 1260 (11th Cir. 2000). "We review the district court's findings of fact for clear error." *Bryant v. Rich*, 530 F.3d 1368, 1377 (11th Cir. 2008). "For all other facts, we accept as true the facts pleaded in [the plaintiff's] complaint and draw all reasonable inferences in his favor."

11

*Whatley v. Smith*, 898 F.3d 1072, 1082 (11th Cir. 2018).  We construe *pro se* pleadings liberally.  *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998).

### III.    Discussion

The PLRA limits suits prisoners can bring regarding prison conditions:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  This exhaustion requirement is mandatory and has been interpreted to mean "proper exhaustion."  *Woodford v. Ngo*, 548 U.S. 81, 93 (2006).  "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings."  *Id*. at 90–91.

However, the exhaustion requirement contains a textual exception, as the "requirement hinges on the 'availability' of administrative remedies."  *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016) (alteration adopted).  In other words, a prisoner is not required to exhaust administrative remedies that are "unavailable" to him.  *Id.*  In *Ross*, the Supreme Court listed three circumstances in which an administrative procedure is considered "unavailable" to prisoners: (1) where the administrative procedure "operates as a simple dead end—with officers unable or

12

consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use . . . [and] no ordinary prisoner can discern or navigate it"; and (3) when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. at 1859–60.

To determine if an administrative remedy has been exhausted, we have said that a district court must use the two-step test for exhaustion set forth in *Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir. 2008) (citations omitted):

> First, the court looks to the factual allegations in the defendant's motion to dismiss and those in the plaintiff's response, and if they conflict, takes the plaintiff's version of the facts as true. If, in that light, the defendant is entitled to have the complaint dismissed for failure to exhaust administrative remedies, it must be dismissed. . . . If the complaint is not subject to dismissal at the first step, where the plaintiff's allegations are assumed to be true, the court then proceeds to make specific findings in order to resolve the disputed factual issues related to exhaustion. The defendants bear the burden of proving that the plaintiff has failed to exhaust his available administrative remedies.

To make these specific findings, courts should treat the question of exhaustion as a matter in abatement and look outside the pleadings to make factual findings. *See Bryant*, 530 F.3d at 1376 ("Where exhaustion—like jurisdiction, venue, and service of process—is treated as a matter in abatement and not an adjudication on the merits, it is proper for a judge to consider facts outside of the pleadings and to resolve factual disputes so long as the factual disputes do not decide the merits and

the parties have sufficient opportunity to develop a record."). Where a district court fails to apply properly the two-step *Turner* test when addressing the question of exhaustion and the *availability* of the grievance process, remand is appropriate so that the district court may conduct the *Turner* analysis in the first instance. *See Whatley v. Warden, Ware State Prison*, 802 F.3d 1205, 1211 (11th Cir. 2015).

In his complaint and in his affidavit, Jenkins clearly asserted that the grievance process was unavailable to him based on (at least) the third circumstance identified in *Ross*—namely, that the actions of the prison staff rendered the administrative grievance process unavailable to him. [1] Within this framework, we held in *Turner* that a prison official's threats of retaliation can render the administrative grievance process unavailable if: "(1) the threat actually did deter the plaintiff inmate from lodging a grievance or pursuing a particular part of the process; and (2) the threat is one that would deter a reasonable inmate of ordinary firmness and fortitude" from participating in the process. *Turner*, 541 F.3d at 1085.

Here, the district court did not follow the proper two-step *Turner* test when deciding if Jenkins had properly exhausted an available grievance system. After

---

[1] We note that some of Jenkins's allegations, such as Sloan keeping a file of all his grievances so they would not be answered, possibly go beyond the threats of retaliation present in *Turner* which fell easily into *Ross* category three. *See Ross*, 136 S. Ct. at 1859–60. On remand, the district court will have to determine, in light of *Ross* and *Turner*, how to analyze Jenkins's various types of allegations in the first instance.

14

laying out the grievance record filed by the defendants and the steps required to exhaust Florida's grievance procedures, the district court summarily concluded that:

> Defendants have satisfied their burden of proving Plaintiff failed to properly exhaust available administrative remedies prior to filing this federal lawsuit.  In order for exhaustion to be complete, the Florida Administrative Code clearly requires the filing of a proper grievance appeal.  As described above, Plaintiff filed grievance appeals, but they were returned to him because he had failed to file formal grievances on the matter or had failed to attach to his grievance appeal the formal grievance(s) and response(s).  Plaintiff was given the opportunity to correct the deficiency but failed to do so.

Nothing indicates that the district court credited the plaintiff's versions of events as true, as required by the first *Turner* step.  Nor did the district court identify conflicts in the two versions of events and make specific factual findings to resolve them, as required by step two.

Moreover, the district court also erred in evaluating the evidence that Jenkins submitted regarding his assertion that the grievance process was unavailable to him due to the defendants' retaliatory actions.  Specifically, the district court concluded that Jenkins did "not specifically identify any actions that were taken against him with retaliatory animus as a way to prevent or deter him from filing his grievances, and more particularly his grievance appeals," and that his broad, conclusory assertions of retaliation were insufficient to demonstrate unavailability of the grievance process.  Jenkins did not "specifically identify any

actions that were taken against him with retaliatory animus." His sworn affidavit, attached to his response to the motion to dismiss, sets forth pages of specific actions that each defendant allegedly took to deter him or prevent him from filing grievances. [2]

## IV.    Conclusion

Because the district court failed to apply the proper *Turner* analysis, we reverse and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

---

[2] We note that "failure to exhaust is an affirmative defense under the PLRA," and "inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock*, 549 U.S. 199, 216 (2007). Therefore, the fact that Jenkins did not specifically address the availability of the grievance process until his response to the defendants' motion to dismiss is irrelevant to the exhaustion determination, and his sworn affidavit is properly admitted evidence regarding that determination.